AO 106 (Rev. 04/10) Application for a Search Warrant

AUSA Litton

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio ▾

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Information associated with the cellular telephone
assigned call number 513-928-1515 that is stored at
premises controlled by T-Mobile

Case No.  2:24-mj-80

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2114 | Assault and/or robbery of a postal employee |

The application is based on these facts:
See attached affidavit in support, incorporated here by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Tyler Schwab FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  Feb. 13, 2024

City and state:  Columbus, Ohio

_____
Kimberly A. Jolson
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVISE ASSIGNED CALL NUMBER (513) 928-1515 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE | Case No. 2:24-mj-80 _____ **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Tyler Schwab, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (513) 928-1515 ("the SUBJECT PHONE") that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered in Overland Park, Kansas. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since January 6, 2019. I have been assigned to the FBI Safe Streets Task Force in Columbus, Ohio, since January of 2023. Prior to being assigned to the Safe Streets Task Force, I was assigned to the Joint Terrorism Task Force (JTTF) for approximately four years. During my assignment at the JTTF, I was a Case Agent and Co-Case Agent for multiple international and domestic terrorism

investigations. While assigned to the JTTF, I received specialized training in international terrorism and homicide investigations. Furthermore, I have received training in computer-related crimes as well as in the criminal use of email, social media, and telephonic communications. As a Special Agent with the FBI, I am empowered to enforce the criminal laws of the United States.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

### BACKROUND ON RECENT POSTAL ROBBERIES AND MAIL THEFT

4.      Federal law prohibits people from assaulting United States Postal Service (USPS) letter carriers with the intent to rob them of mail matter, money, or other property that belongs to the United States and that was then in the lawful charge, control, or custody of the letter carrier. 18 U.S.C. § 2114(a). The same statute prohibits people from robbing or attempting to rob those letter carriers of mail matter, money, or other property that belongs to the United States and that was then in the lawful charge, control, or custody of the letter carrier. *Id.*

5.      When someone commits such an assault or robbery and puts in jeopardy the life of the individual having custody of such mail, money, or other property of the United States by the use of a dangerous weapon, that person commits an "aggravated" assault or robbery under 18 U.S.C. § 2114(a), which qualifies as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A).

2

*Knight v. United States*, 936 F.3d 495, 501 (6th Cir. 2019). As such, when someone uses or carries a firearm during and in relation to an aggravated assault or robbery under § 2114(a), they have also violated 18 U.S.C. § 924(c)(1)(A). *Knight*, 936 F.3d at 497, 501

6.     Federal law also prohibits people from stealing any key to any lock box, lock drawer, or other authorized receptacle for the deposit or delivery of mail matter. 18 U.S.C. § 1704.

7.     Finally, federal law prohibits people from stealing or attempting to steal any mail matter from or out of any mail receptacle or from any letter carrier. 18 U.S.C. § 1708. The same statute prohibits people from buying, receiving, concealing, or unlawfully possessing any mail matter that has been so stolen if the person has knowledge that the item was so stolen. *Id.*

8.     The United States, including the United States Postal Inspection Service (USPIS) and the FBI, has been conducting a criminal investigation into violations of 18 U.S.C. §§ 2114(a), 924(c), 1704, and 1708 committed in and around Central Ohio. The current investigation involves a pattern of violent, armed robberies wherein the suspect(s) hold USPS letter carriers at gunpoint and then force them to hand over their USPS "arrow keys" or "modified arrow keys." USPS letter carriers carry arrow keys and modified arrow keys when they deliver the mail. These keys allow letter carriers to gain entry to secured mail receptacles ("blue boxes") and secured cluster mailboxes found at apartment and condominium complexes. As of the writing of this affidavit, approximately thirty robberies have occurred from January 5, 2022, to December 7, 2023, throughout the Columbus, Ohio area that have been identified as part of this pattern.

9.     Once the suspect(s) obtain the stolen keys, those suspect(s) then use those keys to open secure mail receptacles and cluster boxes to steal mail matter. This process of stealing the mail is sometimes referred to as "fishing." The stolen mail matter includes, among other valuable items, personal checks, business checks, and other negotiable financial instruments.

3

The suspect(s) then wash these checks and/or reproduce them through fraudulent means before subsequently cashing and/or depositing them at ATMs and other locations. This process of washing and/or reproducing the checks is sometimes referred to as "cooking."

10.     Because a stolen USPS key can be utilized to "fish," "cook," and subsequently profit from, the stolen keys retain intrinsic value in and of themselves. I have learned that suspect(s) who rob letter carriers of their keys will sometimes sell those keys to third parties or "rent" them out to third parties for a discrete period without ever fishing or cooking themselves.

11.     I know, based on my knowledge, training, and experience, that individuals who are involved in the criminal activity described above often use cell phones to coordinate the initial assaults and/or robberies of the letter carriers and to facilitate the fishing, cooking, and financial crimes previously described.

12.     More specifically, I know that individuals involved in the criminal activity described above use cell phones to coordinate meetups with co-conspirators and others involved in the planning and execution of the initial postal assaults and/or postal robberies—including to procure firearms for use during those assaults and/or robberies. Those individuals also use cell phones for navigation purposes both to and from the site of an assault and/or robbery. Likewise, those individuals use cell phones to take photographs and videos of themselves in possession of stolen USPS keys and/or stolen mail matter. Those same individuals also use cell phones to coordinate the sale and/or rental of USPS keys to third parties. Finally, those individuals use cell phones to coordinate the fishing, cooking, and negotiation of stolen or fraudulent financial instruments. This use of cell phones involves calls, texts, social media applications, navigation tools, and a host of other available applications.

4

13.     I also know from my training and experience that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

## PROBABLE CAUSE

14.     I submit there is probable cause to believe that a violation of 18 U.S.C. § 2114(a) [Aggravated Assault/Robbery of Postal Employees] has been committed by Antonio Peake (PEAKE), also known as "TONE" and "JA GREEN," and other individuals both known and unknown. There is also probable cause to search the information described in Attachment A for evidence of this crime as further described in Attachment B.

### Armed Robbery #1-4733 Parkway Village Drive, Grove City, Ohio

15.     On April 24, 2023, at roughly 11:30 a.m., Inspectors with the USPIS responded to 4733 Parkway Village Drive, Grove City, Ohio, in reference to a robbery of a postal worker.

16.     Upon arrival, Inspectors spoke with postal worker victim "K.H.," a person over eighteen years old, who advised the following:

17.     While delivering mail at the community mailboxes within the Parkway Village Apartment complex, K.H. was approached from behind. The suspect had a handgun and placed it against K.H.'s side. The suspect then demanded K.H. give him his keys. K.H.'s postal keys were in the community mailbox lock. K.H. retrieved his postal keys from the community mailbox lock and gave them to the suspect. The suspect got away with K.H.'s arrow key, other postal keys, gas card, and a backpack of personal belongings.

18.     On August 18, 2023, and September 8, 2023, Postal Inspectors and other law-enforcement agents, including your affiant, met with a cooperating informant who was involved

in, participated in, helped plan, and had knowledge of multiple armed postal robberies and attempted postal robberies committed in the Columbus, Ohio area and elsewhere. That informant ("CI #1") admitted to his own role in roughly a dozen postal robberies – either as a planner, facilitator, or participant – and shared information regarding the spate of other recent postal robberies, mail theft, and related financial crimes described throughout this affidavit. CI #1 is currently facing federal charges for his role in several of these robberies. CI #1 met with investigators in the hope of receiving more favorable consideration in his current case, but no promises were made to him regarding the nature or extent of any charging and/or sentencing leniency. To date, the information that CI #1 provided has proved truthful and reliable through corroboration from other human sources, law-enforcement reports, cell-site location data and GPS location data, and other electronic evidence obtained during this investigation.

19. Additionally, on June 28, 2023, July 13, 2023, and August 8, 2023, Postal Inspectors and other law-enforcement agents, including your affiant, met with another cooperating informant who had knowledge of multiple postal robberies committed in the Columbus, Ohio area. The informant (CI #2) admitted to being a witness to the planning, facilitating, and participation of postal robberies and related financial crimes described throughout the affidavit. CI #2 is not currently facing federal charges. CI #2 met with investigators in the hope of receiving more favorable consideration if charges were to be filed against her, but no promises were made to her regarding the nature or extent of any charging and/or sentencing leniency. To date, the information that CI #2 provided has proved truthful and reliable through corroboration from other human sources, law enforcement reports, cell-site location data and GPS location data, and other electronic evidence obtained during this investigation.

20.     During CI #1's August 18, 2023 interview, he identified a photo of Antonio Peake, whom he referred to as "TONE." According to CI #1, he viewed "TONE" as somewhat of a business partner when it came to robbing postal workers, obtaining arrow keys, and "fishing." CI #1 stated that the two of them started working together around December of 2022, to obtain the newer style of postal key. CI #1 told investigators that "TONE" and another individual would provide the locations of postal workers who had the newer style postal key and what time the postal workers would be in a specific area delivering mail. According to CI #1, "TONE" was able to figure this out by watching mailboxes that required the newer style postal key and noting the time the postal worker delivered mail there.

21.     CI #2 also told Investigators that an individual she knew as "TONE" started paying individuals to do postal robberies, stealing mail, and getting bank accounts to deposit fraudulent checks around Christmas time of 2022. CI #2 did not know "TONE's" true name, but referred to him as "TONE" and knew he also went by "JA GREEN" on social media.

22.     CI #1 stated that for the Grove City robbery, "TONE" asked CI #1 to get Thierno Bah, also known as "Wopo," to commit the robbery. According to CI #1, Bah and another individual ended up committing this postal robbery. Bah is currently facing federal charges and has pled guilty for his role in several postal robberies. CI #1 stated that prior to the robbery, he was with CI #2. CI #1 told Investigators that he and CI #2 picked up Bah prior to the robbery and drove to a Menards parking lot on the Westside of Columbus where they met "TONE" and other individuals both known and unknown. According to CI #1, when they got to Menards, Bah got out of CI #1's vehicle and got into a different vehicle with at least one other individual. CI #1 then told Investigators that everyone then departed Menards, and Bah went and committed the postal robbery. According to CI #1, he and CI #2 departed Menards and made DoorDash deliveries.

23.     CI #1 and CI #2 both stated that, following the postal robbery, CI #1 and CI #2 met Bah, "TONE," and others at a McDonald's. According to CI #1 and CI #2, after meeting at McDonald's, everyone went down the street to a neighborhood where they exchanged money for the postal keys. According to CI #1, he went in on paying for half of this robbery with "TONE." CI #1 told Investigators that he paid $500 in cash to Bah and "TONE" paid Bah $1,000 in cash. CI #2 stated that she saw Bah and others get paid approximately $1,500 in cash from "TONE" for committing the robbery. According to CI #1, "TONE" ended up keeping the key from this robbery.

24.     At the time of this robbery, CI #1 was under court-ordered electronic monitoring while out on bond in an unrelated criminal case. As a result, CI #1 was wearing an ankle monitor that recorded his locations. CI #1's ankle monitor corroborates what he told investigators as his ankle monitor recorded CI # 1's locations on April 24, 2024, at the following times:

- CI #1 was in the Menards parking lot located at 831 Hilliard Rome Road (Westside of Columbus) from approximately 10:03 a.m. to 10:12 a.m.

- CI #1 was at McDonald's located at 4601 West Broad Street from approximately 10:28 a.m. to 10:38 a.m.

- CI #1 was at McDonald's located at 2441 Lockbourne Road from approximately 12:07 p.m. to 12:29 p.m.

- CI #1 was then in a neighborhood located on Edsel Avenue which is Southeast of the McDonald's located at 2441 Lockbourne Road from 12:34 p.m. to 12:46 p.m.

25.     According to CI #2, the meetup location prior to the postal robbery taking place with "TONE" and others was at a McDonald's on Lockbourne Avenue, not Menards, like CI #1 said. Based on the ankle monitor GPS locations, CI #1 and CI #2 went to both Menards and McDonald's prior to the postal robbery taking place. The McDonald's they went to prior to the

8

postal robbery was located at 4601 West Broad Street, not Lockbourne Avenue like CI #2 said. However, the McDonald's CI #1, CI #2, "TONE," and others met at following the robbery was located at 2441 Lockbourne Road. Based on my experience, witnesses will sometimes recount big events accurately but confuse the minute details, such as meeting locations, as time passes from when the event occurred and when they speak with Investigators. This seems to be the case here as CI #1 and CI #2 differed on where the meetup took place prior to the robbery.

### Armed Robbery #2-2873 West Broad Street, Columbus, Ohio

26. On May 11, 2023, at approximately 9:26 a.m., Inspectors with the USPIS responded to the Post Office located at 2873 West Broad Street in reference to a robbery of a postal worker.

27. Upon arrival, Inspectors spoke with postal worker victim B.F. (a person over 18 years old) who advised the following:

28. While outside the Post Office, the suspect approached B.F. and told her to give him the keys. When B.F. asked the suspect what keys he was referring to, the suspect hit B.F. on the side of her head with a gun. The suspect then demanded the keys again. B.F. was then followed by the suspect into the Post Office. Once inside the Post Office, B.F. got the arrow keys from the retail window and threw them at the suspect. The suspect then departed the Post Office on foot. During this robbery, the suspect was able to steal an arrow key and a modified arrow key.

29. CI #1 told investigators that, following the April 24, 2023 postal robbery, "TONE" and another individual found a new location where they could get the newer style postal key. According to CI #1, "TONE" and the other individual again asked CI #1 to get Bah to commit the postal robbery. CI #1 told Investigators that Bah said he would do the robbery, but he needed a driver. According to CI #1, Bah brought another individual with him to participate in this postal robbery, which occurred on May 11, 2023.

30.     Both CI #1 and CI #2 stated that on the morning of May 11, 2023, CI #1 and CI #2 picked up Bah and another individual and drove them to meet "TONE" and others. According to CI #1, the meeting with "TONE" and others took place at a Rally's located on Livingston Avenue and Alum Creek Drive. CI #1 told Investigators that, when they got to Rally's, "TONE" and other individuals, both known and unknown, were there. CI #1 stated that while at Rally's, Bah and the other individual whom CI #1 and CI #2 picked up earlier that morning got into a silver vehicle. CI#1 described the vehicle as a silver Chevy Impala. CI #2 told Investigators that the vehicle was either a silver Chevy Impala or a silver Chevy Malibu. According to CI #1, Bah was in the silver vehicle with the other individual CI #1 and CI #2 picked up earlier that morning and one other individual. CI #1 told investigators that Bah and the two other individuals then departed the Rally's and went to commit the postal robbery. According to CI #1, prior to the robbery taking place, one of the individuals exited the vehicle while Bah and the third individual continued on and committed the postal robbery.

31.     According to CI #1, Bah and the other individual ended up getting one newer style postal key and one older style arrow key during this robbery. CI #1 told investigators that he paid Bah and the other individual who committed the postal robbery either $700 or $750 via CashApp. According to CI #1, "TONE" and another individual paid Bah the other half of the money, either $700 or $750. CI #1 told investigators that he ended up keeping the keys from this robbery but loaned them out to "TONE" and another individual who went "fishing" with them. According to CI #1, "TONE" and the other individual eventually returned these keys to CI #1.

32.     CashApp records show that, shortly after the robbery, CI #1 paid Bah $500.00. Bah went by the name "Wopoonese," on CashApp. The same records show that, shortly after the robbery, CI #1 paid the other individual who committed the postal robbery $250.00.

33.     On May 18, 2023, a federal search warrant was executed at CI #1's residence. During the search of the residence, both postal keys that were taken during the postal robbery that occurred on May 11, 2023, were found in CI #1's bedroom.

34.     According to CI #2, the meeting with "TONE" and others that occurred prior to the postal robbery taking place occurred at a McDonald's. However, CI #1's ankle monitor shows that CI #1 was at the following locations on May 11, 2023:

- CI #1 was in the area of 394 North Monroe Avenue, Columbus, Ohio picking up Bah at his girlfriend's apartment at 6:30 a.m.

- CI #1 was in the area of Castlewood Road and Kenwick Road picking up the other individual at 6:45 a.m.

- CI #1 was at Rally's located at 1940 East Livingston Avenue, Columbus, Ohio at 6:51 a.m.

35.     Again, CI #2 did not get the location of the meeting with "TONE" and others correct. CI #2 told investigators that the meeting took place at a McDonald's when, according to CI #1's ankle monitor, it took place at a Rally's located on Livingston Avenue. Again, it is understandable that CI #2 did not get the location of the meeting correct as approximately two months passed before she met with Investigators.

## IDENTIFICATION OF PHONE

36.     According to T-Mobile records, the subscriber of phone number (513) 928-1515 was Antonio Peake. PEAKE was the subscriber of phone number (513) 928-1515 from February 17, 2022, to August 10, 2023—i.e., during the timeframe of both robberies described throughout this affidavit.

37. In my training and experience, I have learned that T-MOBILE is a company that provides cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

38. Based on my training and experience, I also know that T-Mobile can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

39. Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such

12

as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONES' user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

40.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

41.     I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to those carriers, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

42.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

_____

Tyler Schwab
Special Agent
FBI

Subscribed and sworn to before me on__Feb. 13_____, 2024

_____

Kimberly A. Jolson
United States Magistrate Judge

14

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number (513) 928-1515 ("the Account") that are stored at premises controlled by T-Mobile ("the Provider"), headquartered in Overland Park, Kansas.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to Be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period between April 22, 2023, and May 13, 2023.

   a.    The following information about the customers or subscribers of the Account:

      i.     Names (including subscriber names, user names, and screen names);

      ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

      iii.   Local and long distance telephone connection records;

      iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

      v.     Length of service (including start date) and types of service utilized;

      vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

      vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

      viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b.    All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i.    the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers [call detail records]), email addresses, and IP addresses); and

        ii.    information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II.    Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C § 2114 (assaulting or robbing any person who has lawful charge, control, or custody of any mail matter or of any money or other property of the United States), for the time period of April 22, 2023, and May 13, 2023, for the Account listed in Attachment A.

17